UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

FIRST PREMIER BANK and ) Civ. 11-4103-KES
PREMIER BANKCARD, LLC, )
)
      Plaintiffs, )
)
  vs. ) ORDER GRANTING
) PLAINTIFFS' MOTION FOR
) PRELIMINARY INJUNCTION
THE UNITED STATES CONSUMER )
FINANCIAL PROTECTION BUREAU; )
and TIMOTHY F. GEITHNER, in his )
official capacity as Secretary of the )
United States Department of the )
Treasury and acting Director of the )
Consumer Financial Protection )
Bureau, )
)
      Defendants. )

      Plaintiffs, First PREMIER Bank and PREMIER Bankcard, LLC (First

Premier), move the court for a preliminary injunction to postpone and enjoin

the October 1, 2011, effective date of the 2011 amendment to § 226.52 of

Regulation Z. Defendants, The United States Consumer Financial Protection

Bureau (the Bureau), and Timothy F. Geithner, oppose that motion.

**BACKGROUND**

      Congress enacted the Credit Card Accountability and Responsibility and

Disclosure Act of 2009 (the Credit CARD Act) to regulate the timing and

manner of collecting credit card fees. The Credit CARD Act amended the Truth

in Lending Act (TILA). TILA's primary purpose was to ensure "meaningful

disclosure of credit terms" so consumers could compare available credit terms, "avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

Within the Credit CARD Act, Congress limited the manner by which creditors could charge fees for the type of cards associated with an "open end consumer credit plan" or what is known as a "harvester" card. Docket 28 at 2-3. At issue in this case is the language in the act referring to fees charged to the account balance or credit line during the first year after the credit card account is opened. Congress expressed:

(1)   In general

If the terms of a credit card account under an open end consumer credit plan require the payment of any fees (other than any late fee, over-the-limit fee, or fee for a payment returned for insufficient funds) by the consumer in the first year during which the account is opened in an aggregate amount in excess of 25 percent of the total amount of credit authorized under the account when the account is opened, no payment of any fees (other than any late fee, over-the-limit fee, or fee for a payment returned for insufficient funds) may be made from the credit made available under the terms of the account.

(2)   Rule of Construction

No provision of this subsection may be construed as authorizing any imposition or payment of advance fees otherwise prohibited by any provision of law.

15 U.S.C. § 1637(n).

The Board of Governors of the Federal Reserve System (the Board)[1] originally had authority to administer and implement TILA and the Credit CARD Act when it became law. Docket 28 at 4 n.2; 15 U.S.C. § 1604. After July 21, 2011, the Bureau assumed that authority. Docket 28 at 4 n.2; 12 U.S.C. § 5512(a). Under section 2 of the Credit CARD Act, the Board had the authority to "issue such rules and publish such model forms as it considers necessary to carry out this Act and the amendments made by this Act." Credit CARD Act of 2009, Pub. L. No. 111-24, § 2, 123 Stat. 1734. The Board also had authority to issue rules under section 105(a) of TILA, which was designed to prevent circumvention or evasion of TILA. 15 U.S.C. § 1604(a).

In 2010 the Board issued regulation § 226.52 within Regulation Z, which mirrored the language of § 1637(n). The 2010 regulation provides:

(a)   Limitations during first year after account opening.

(1)   General Rule. Except as provided in paragraph (a)(2) of this section, if a card issuer charges any fees to a credit

---

[1] The complaint named the Board of Governors of the Federal Reserve System and members of the Board, Ben S. Bernanke, Janet L. Yellen, Kevin M. Warsh, Elizabeth A. Duke, Daniel K. Tarullo, and Sarah Bloom Raskin as defendants in their official capacity. The Dodd-Frank Act, however, automatically substitutes the Bureau for the Board in "any proceeding commenced by or against the Board . . . before the designated transfer date with respect to any consumer financial protection function of the Board . . . transferred to the Bureau." Dodd-Frank Act § 1063(a)(2), 12 U.S.C. § 5583(a)(2). On September 1, 2011, the court issued an oral order, with the consent of First Premier, that substituted the Bureau and Timothy F. Geithner, as Secretary of the United States Department of the Treasury and acting Director of the Consumer Financial Protection Bureau, as the proper defendants.

card account under an open-end (not home-secured) consumer credit plan during the first year after the account is opened, the total amount of fees the consumer is required to pay with respect to the account during that year must not exceed 25 percent of the credit limit in effect when the account is opened.

(2) Fees not subject to limitations. Paragraph (a) of this section does not apply to:

    (i)   Late payment fees, over-the-limit fees, and returned-payment fees; or

    (ii)  Fees that the consumer is not required to pay with respect to the account.

(3) Rule of construction. This paragraph (a) does not authorize the imposition or payment of fees or charges otherwise prohibited by law.

12 C.F.R. § 226.52(a). This regulation currently is in effect.

Following the promulgation of § 226.52, First Premier began a new program (the program) that offered credit cards and required an up-front fee that the consumer had to pay before opening an account. Docket 28 at 6. With the Credit CARD Act and Regulation Z in mind, First Premier structured and operated the program in accordance with that law and regulation. The credit cards issued under the plan typically are utilized by consumers who cannot qualify for traditional credit cards because they have bad credit. Docket 28 at 7. Because a number of these consumers default on their payments, First Premier charges up-front fees prior to account opening that range from $25 to $95 per account. *Id.* First Premier requires customers to pay this fee in full before credit is extended under the account, and the consumer cannot pay the

up-front fee with the credit available under the account. Docket 30 ¶ 14. This method is advantageous because the consumer better understands the purpose of the fee, and it does not reduce the available credit on the account. *Id.*

On November 2, 2010, the Board published proposed amendments to § 226.52 of Regulation Z. The Board engaged in the requisite notice and comment period, and First Premier sent a comment letter stating that the Board's proposed amendment to change the fee language from "during the first year" to include "prior to account opening" was in excess of the Board's authority and not in accordance with law. Docket 28 at 10. The Board took final action on March 18, 2011, and promulgated its revisions to § 226.52.

The amendment to the regulation (2011 regulation) changes the relevant language to:

(a)   Limitations prior to account opening and during first year after account opening.

(1)   General rule. Except as provided in paragraph (a)(2) of this section, the total amount of fees a consumer is required to pay with respect to a credit card account under an open-end (not home-secured) consumer credit plan prior to account opening and during the first year after account opening must not exceed 25 percent of the credit limit in effect when the account is opened. For purposes of this paragraph, an account is considered open no earlier than the date on which the account may first be used by the consumer to engage in transactions.

Proposed Rules Federal Reserve System, 75 Fed. Reg. 67,458, 67,490-91 (Nov. 2, 2010) (to be codified at 12 C.F.R. pt. 226). The Board states that the

5

amendment was necessary to preserve "the statutory relationship between the costs and benefits of opening a credit card account." *Id.* at 67,475. When promulgating the 2011 regulation, the Board relied on its authority under section 2 of the Credit CARD Act and section 105(a) of TILA to prevent evasion and circumvention of the purposes of TILA. *Id.* The "Effective Date" and "Mandatory Compliance Date" is October 1, 2011. Docket 28 at 11.

First Premier brought its claim for declaratory judgment and injunctive relief on July 20, 2011, asking the court to invalidate the challenged portion of the amendment under the Administrative Procedure Act and enjoin its implementation. Docket 1. A hearing on First Premier's motion for preliminary injunction was held on September 1, 2011. First Premier asks for preliminary injunctive relief to postpone the effective date of the amendment to preserve the position of the parties until the judicial-review process is complete. Docket 1 at 19.

## STANDARD OF REVIEW

Plaintiffs bring this challenge under the Administrative Procedure Act, which establishes the court's scope of review. The APA allows judicial review of agency actions. *Sierra Club v. Kimbell*, 623 F.3d 549, 558-59 (8th Cir. 2010) (citation omitted). The reviewing court will not set aside the agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 559 (quoting 5 U.S.C. § 706(2)(A)). An agency decision is arbitrary and capricious when:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Cent. S.D. Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 894 (8th Cir. 2001) (citation omitted). The reviewing court should not cure any agency deficiencies by supplying reasoning for the agency's decision that it did not include. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Under the APA, courts have the power to postpone the effective date of proposed agency action:

On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

5 U.S.C. § 705. Agency action may be set aside when it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "not in accordance with law." 5 U.S.C. §§ 706(2)(C); 706(2)(A). Courts use the same standard to decide applications for stays of administrative action as for preliminary injunction determinations. *B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 905 (N.D. Iowa 2008).

**ANALYSIS**

**I.    Motion for Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003) (citations omitted). "A plaintiff is required to make only a prima facie showing that there has been an invasion of its rights and that a preliminary injunction is essential to the assertion and preservation of those rights." *Livestock Mktg. Ass'n v. U.S. Dep't of Agric.*, 132 F. Supp. 2d 817, 824 (D.S.D. 2001) (citation omitted). "The party seeking a preliminary injunction bears the burden of establishing the necessity of this equitable remedy." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009) (citing *Watkins*, 346 F.3d at 844).

The analysis of preliminary injunction motions begins with the test established in *Dataphase. Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981). While there are four factors in a preliminary injunction analysis, the most significant factor is whether the proponent of the preliminary injunction can show that he or she will prevail on the merits of the claim. *Livestock Mktg. Ass'n*, 132 F. Supp. 2d at 824 (citing *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 59 F.3d 80, 83 (8th Cir. 1995)). While no single factor is dispositive, each must be examined as to whether it weighs for or against granting the injunction. *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (citations omitted). To determine whether a

preliminary injunction is appropriate against agency action, relevant considerations are:

(1)    whether the movant is 'likely to prevail on the merits';

(2)    the threat of irreparable harm to the movant;

(3)    the state of balance between this harm and the injury that granting the injunction will inflict on the other parties litigant; and,

(4)    the public interest.

*TCF Nat'l Bank v. Bernanke*, 643 F.3d 1158, 1162 (8th Cir. 2011) (citing *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 733 (8th Cir. 2008); *Dataphase Sys., Inc.*, 640 F.2d at 113).

### A.    Likely to Prevail on the Merits

First Premier argues it is likely to succeed on the merits because the language of the statute implementing the Credit CARD Act is unambiguous, so the Board's extension of the time period from "during the first year" to "prior to account opening and during the first year" exceeds its statutory authority and is not in accordance with law. First Premier claims that under either step one or step two of the *Chevron* deference test it will prevail on the merits of its claim.

Because First Premier seeks "to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," it has to show more than a "fair chance" that the court will determine the rule is invalid. *Planned Parenthood*, 530 F.3d at 731-32. Instead, First Premier must show

9

that a favorable ruling is "likely." *Id.* at 732 & n.4. This higher standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 732 (citation omitted). For the purposes of this motion, the court will assume without deciding that First Premier must satisfy the more stringent standard set in *Planned Parenthood* that it is "likely" to prevail.[2]

"Likelihood of success on the merits requires that the movant find support for its position in governing law." *B & D Land & Livestock Co.*, 534 F. Supp. 2d at 906 (citations omitted). To determine whether an agency has validly promulgated administrative regulations generally invites analysis under the *Chevron* test. Under *Chevron*, the court determines: (1) whether Congress has directly spoken on the question or issue, and (2) if Congress has not spoken, whether the agency's interpretation is based on a "permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

---

[2] The Eighth Circuit Court of Appeals has not expressly applied the higher *Dataphase* test to administrative regulations. But as expressed in *Planned Parenthood*, "[w]here preliminary injunctions are sought to enjoin . . . administrative actions by federal . . . agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine to what extent the challenged action represents 'the full play of the democratic process' and, thus, deserves the deference of the traditional test." *Planned Parenthood*, 530 F.3d at 733 n.6 (citing *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995)).

### 1. Has Congress directly spoken on the precise issue, and is the language of the statute unambiguous?

"First, always, is the question whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. In that first step, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Livestock Mktg. Ass'n*, 132 F. Supp. 2d at 826 (quoting *Chevron*, 467 U.S. at 842). The Supreme Court recognized:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Livestock Mktg. Ass'n*, 132 F. Supp. 2d at 826-27 (quoting *Chevron*, 467 U.S. at 842-43).

The language of the relevant statute that is applicable in this case is the type of fee and time period that § 1637(n) purports to regulate. First Premier claims that the amendment to Regulation Z changes the language from "during the first year" to "prior to account opening and during the first year" and this change impermissibly extends a firm and concrete time-line established by Congress. First Premier also claims that the Board is attempting to preclude fees that are not addressed under the statutory language. When examining the language of a challenged statute, the court

11

must look to the plain language of that section as well as how it operates as a whole. Section 1637(n) provides:

> If the terms of a credit card account under an open end consumer credit plan *require the payment of any fees* (other than any late fee, over-the-limit fee, or fee for a payment returned for insufficient funds) by the *consumer in the first year during which the account is opened* in any aggregate amount in excess of 25 percent of the total amount of credit authorized under the account when the account is opened, no payment of any fees (other than any late fee, over-the-limit fee, or fee for a payment returned for insufficient funds) *may be made from the credit made available under the terms of the account.*

15 U.S.C. § 1637(n)(1). The court must look at this plain language of the statute and determine if it is clear and unambiguous or if Congress left a gap for the agency to fill.

If you eliminate all the surplusage in the statute, it would read as follows: If the total fees exceed 25 percent of the credit limit on the account during the first year of the account, then the fees cannot be charged to the account. The plain language indicates that this statute is only meant to prevent creditors from charging fees to the credit balance itself, which would deceptively reduce the available credit the consumer has available to him or her when first opening the account. Nothing in the plain language of this statute implies that it is meant to prohibit creditors from charging pre-account fees or any other fees as long as they are not charged to the account.

The statute is clear and unambiguous. The language of the statute explicitly refers to the fees charged to the account as those that reduce the

credit limit, and the statute also is clear as to the time period to which fees may be charged. The plain language gives an express 365-day window when it says "in the first year that the account is opened." This is the only time-frame that the statute references, and Congress's meaning of that time period is unambiguous. Defendants claim that review of the plain language necessitates application of the "broad purposes" of the legislation in question, but the court will not read intentions into plain language. *See Bd. of Governors of the Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) ("Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, the final language of the legislation may reflect hard-fought compromises. Invocation of the 'plain purpose' of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise, and, in the end, prevents the effectuation of congressional intent.").

Even if the court did consider the legislative history and Congressional intent, it would support the conclusion of the plain language determination. The legislative history of the Credit CARD Act expresses that this legislation was intended to quell a specific type of creditor practice—the deceptive charging of excessive fees to a credit balance just to receive credit. The official purpose of the act states that it was intended "to establish fair and transparent practices relating to the extension of credit under an open end

13

consumer credit plan . . . ." Credit CARD Act of 2009, Pub. L. No. 111-24, 123 Stat. 1734 (2009). In a hearing before the Subcommittee on Financial Institutions and Consumer Credit of the House of Representatives, Chairman Luis Gutierrez stated that the Credit Cardholders' Bill of Rights Act of 2009, a precursor to the Credit CARD Act, would protect "vulnerable consumers from high-fee subprime credit cards by preventing these fees from being charged to the card itself." Docket 31-6 at 9. In their response brief, defendants cite a story told to Congress about a sailor who received one of the subprime or "fee harvester" cards and whose account balance was ravaged by fees that drastically reduced his available credit. The story detailed the fees charged to the account before he even had the ability to make a single purchase. Docket 37 at 8 (citing *Credit Card Practices: Fees, Interest Charges, and Grace Periods: Hearing before S. Comm. on Homeland Sec. & Gov't Affairs*, 110th Cong. 69-70). This legislative history leads to the conclusion that the statute was meant to prevent the harm of fees being charged to the account that would reduce the available credit to an unknowing consumer. Defendants cite no other legislative documents that support any other intent or conclusion.

The Board's interpretation of the Credit CARD Act through its proposed rulemaking notice is equally telling as to the act's purpose. The Board stated that Congress wanted to prevent consumers from being harmed by fees charged to the credit card account itself, in particular, those credit cards that were proffered as having a specific credit limit but actually had lower credit

available once the account opened and the initial fees were charged against the account's balance. 75 Fed. Reg. 7658, 7724 (February 22, 2010). The Board's discussion of the Credit CARD Act's purpose also said that the subprime cards that charge fees like an application fee, a program fee, or an annual fee are often billed to the consumer on the first statement and it "substantially reduc[es] from the outset the amount of credit the consumer has available to make purchases or other transactions on the account." *Id.*

Defendants also argue that First Premier's fees are inconsistent with the Congressional intent found in § 127(n)(1) of TILA. Docket 37 at 14. The Board suggested prior to the amendment and after First Premier established the program, that Congress's true intent was "to prevent card issuers from requiring consumers to pay excessive fees in order to obtain a credit card account." *Id.* The Board went on to claim that any fees charged "prior to account opening" would "disturb[] the statutory relationship between the costs and benefits of opening a credit card account." *Id.* But this is the Board's interpretation of Congressional intent, and if Congress determined it wanted to address the concept of the "statutory relationship between the costs and benefits of credit," it would have explicitly done so textually. As shown above, the plain language of the statute does not reflect that intent nor does the legislative history. Rather, each suggests that Congress intended to prevent excessive fees that were charged to the account, which would reduce the credit available to the consumer.

15

The plain language of the statute itself, the legislative history surrounding its enactment, and the Board's initial interpretation of the statute's intent lead to the conclusion that the statute is unambiguous and only gives the Board the authority to promulgate regulations that operate within the boundaries of Congress's clearly expressed delegation. Because the statute unambiguously does not explicitly discuss pre-account opening fees, the court will examine the Board's actions to determine whether extending its rulemaking authority to cover First Premier's conduct was arbitrary and capricious or in excess of its authority under step two.

### 2. Is the proposed amendment promulgated by the Board a permissible construction of the statute?

In the second step of *Chevron*, "[t]he power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Livestock Mktg. Ass'n*, 132 F. Supp. 2d at 827 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)). If there is a gap for the agency to fill, then there is an express delegation of authority, and these legislative regulations "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* (citing *Chevron*, 467 U.S. at 843-44). Finally, the Supreme Court acknowledged that it has long recognized "the principle of deference to administrative interpretations" and "that considerable weight should be accorded to an executive department's

construction of a statutory scheme it is entrusted to administer." *Chevron*, 467
U.S. at 844.

When determining the level of deference to the Board administering TILA
under step two of *Chevron*, case law suggests "that the Board has been
granted a special degree of deference in its administration of TILA."[3] Congress
gave the Board authority to make rules in two sections of the federal code that
are relevant in this case. The Board has power to administer the Credit CARD
Act under its section 2, which provides: "[t]he Board of Governors of the
Federal Reserve System . . . may issue such rules and publish such model
forms as it considers necessary to carry out this Act and the amendments
made by this Act." Credit CARD Act of 2009, Pub. L. No. 111-24, § 2. In
addition, the Board had authority under TILA § 105 to prevent circumvention

_____

[3] *Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of the Fed. Reserve Sys.*, 773 F. Supp. 2d 151, 166 (D.D.C. 2011) (citing *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 219 (1981); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559-60 (1980); *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 369-71 (1973)). *See also Colo. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123, 144 (D.D.C. 2005) ("[C]ourts have consistently read [the *Mourning*] language to describe a heightened level of deference that is due the agency's interpretation of an ambiguous statute under *Chevron* step two, rather than a warrant to override a clear statute under *Chevron* step one.") (citing *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005); *Natural Res. Def. Council v. Jamison*, 815 F. Supp. 454, 471 (D.D.C. 1992)); *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239 (2004); *Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 274 (4th Cir. 2008); *In re Washington Mut. Overdraft Protection Litigation*, 539 F. Supp. 2d 1136, 1145 (C.D. Cal. 2008).

or evasion of TILA, which the Credit CARD Act amended. That section

provides:

> (a) Promulgation, contents, etc., of regulations
>
> The Board shall prescribe regulations to carry out the purposes of this subchapter. Except in the case of a mortgage referred to in section 1602(aa) of this title, these regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

15 U.S.C. § 1604(a).

Defendants argue that *Chevron* does not apply and that another test

called "demonstrably irrational" determines whether the Board's action under

§ 105 is appropriate. The Supreme Court detailed this standard, the history of

TILA, and the power Congress delegated to the Board under TILA in several

cases determined prior to *Chevron*. *See Anderson Bros. Ford v. Valencia*, 452

U.S. 205 (1981); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980);

*Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356 (1973). In regard to agency

action, the Court stated in *Milhollin* that:

> caution requires attentiveness to the views of the administrative entity appointed to apply and enforce a statute. And deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z. Unless *demonstrably irrational*, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive for several reasons.

*Milhollin*, 444 U.S. at 565 (emphasis added).

18

The Supreme Court determined the Board was pivotal in "setting [the statutory] machinery in motion[,]" and "Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law" to guide creditors through TILA's complications. *Id.* at 566. In *Anderson Bros. Ford*, the Court stated that "absent some obvious repugnance to the statute, the Board's regulation implementing this legislation should be accepted by the courts, as should the Board's interpretation of its own regulation." *Anderson Bros. Ford*, 452 U.S. at 219 (citing *Milhollin*, 444 U.S. 555).

Clearly, Congress intends for the Board, and now the Bureau, to be the expert on TILA and the Credit CARD Act and to be afforded more deference than the typical agency, but the language of *Mourning* and its progeny make sense standing alone only in a pre-*Chevron* setting. "In deciding whether to defer to agency determinations or to substitute their own judgment for that of the agency, pre-*Chevron* courts frequently looked to the relative competence of the agency and the court in deciding the matter in question." *Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Nat'l Labor Relations Bd.*, 46 F.3d 82, 90 (D.C. Cir. 1995). When courts wanted to accept "reasonable agency interpretations" they "often referred to the agency's expertise, its familiarity with the history and purposes of the legislation at issue, and its practical knowledge of what will best effectuate the purposes of the statute." *Id.* (citations omitted). Defendants' complete reliance on the authority granted in

19

§ 105 and detailed in the pre-*Chevron* cases falls short without the context of *Chevron* step one's plain language interpretation and Congressional intent or legislative history.

Even though these § 105 TILA cases were decided prior to *Chevron*, the language alludes to what is now step one of the *Chevron* deference test. For instance, the Court stated in *Milhollin* that "[a]t the threshold, therefore, interpretation of TILA and Regulation Z *demands an examination of their express language; absent a clear expression*, it becomes necessary to consider the implicit character of the statutory scheme." *Milhollin*, 444 U.S. at 560 (emphasis added). Beyond that, numerous federal courts have determined that it is appropriate to include language from *Milhollin* and *Mourning* to give the Board more deference than normal under step 2, but to still apply the complete *Chevron* test. *See Co. River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 383 F. Supp. 2d 123, 144 (D.D.C. 2005) ("[C]ourts have consistently read [*Mourning*] to describe a heightened level of deference that is due the agency's interpretation of an ambiguous statute under *Chevron* step two, rather than warrant to override a clear statute under *Chevron* step one.").

With that framework in mind, it is necessary to determine whether the Board acted appropriately within its statutory authority in attempting to fill a gap or statutory silence. Nothing in the plain language of § 1637(n) suggests that Congress wanted this provision to extend beyond addressing the problem of creditors charging consumers more than 25 percent of the credit line

20

through fees charged to the account itself. Because the purpose of the statute is clear and the boundaries were set for the Board to operate within, the authority to make rules and administer § 1637(n) does not extend to applying the language of that statute to pre-account fees when they are not charged to the balance of the card or to the account itself. Whether the Board is attempting to reach First Premier's fees by changing the statutorily-set time period of one year "during which the account is opened" or changing its interpretation of what fees are included in the 25 percent statutory cap, both are impermissible extensions of the Board's authority because it attempts to reach conduct outside the scope of the statute. With the proposed amendment, the Board would change the purpose of the statute from preventing fees that reduce the available credit under the account to reaching any fee the Board does not like. This fundamental shift in statutory policy goes against a clear mandate by Congress and is arbitrary, capricious, and contrary to the Board's statutory authority. While "[t]he statute may be imperfect, [ ] the Board has no power to correct flaws that it perceives in the statute it is empowered to administer." *Dimension Fin. Corp.*, 474 U.S. at 374. The Board's "rulemaking power is limited to adopting regulations to carry into effect the will of Congress as expressed in the statute." *Id.*

The Board is afforded higher deference than the average agency, but the Board cannot fill a gap when none exists. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 538 (2004) (stating that "[t]here is a basic difference between filling a gap

21

left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted") (citation omitted). The Board did not reasonably define an ambiguous term within the statute to reach First Premier's fee, which would have been within its power. Instead it arbitrarily chose to extend a definitive period of time established by Congress to reach a type of fee that is not charged to the account balance and not the sort of deceptive practice Congress meant to extinguish. *See Dimension Fin. Corp.*, 474 U.S. at 368-74 (stating that the Board's definition of banks and associated terms that attempted to bring certain institutions within its authority was unreasonable and outside its authority); *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1124 (8th Cir. 1999) (determining the Forest Service's broadening of a statutorily restrictive phrase "that particular lake" to mean more than one lake and to redefine the term was contrary to the clearly expressed intent of Congress when the plain language and its context were unambiguous).

Congress specifically enumerated what conduct it wanted to reach in § 1637(n), and the Board's regulation covering something far beyond that express direction would be like the Board creating its own gap and then filling it. Separation of powers forbids such leaps absent the express will of Congress. *See Dimension Financial Corp.*, 474 U.S. at 373 n.6 (stating the agency's authority "only permits the Board to police within the boundaries of the Act; it does not permit the Board to expand its jurisdiction beyond the

22

boundaries established by Congress [in the act]"); *see also Colorado River*, 383 F. Supp. 2d at 144-45 (allowing an agency to issue any regulation that is "reasonably related to the purposes of the enabling legislation" is unacceptable, and "would give an agency essentially limitless power to write new law, without any regard for the language or legislative history of the governing statute, so long as it arguably fits within the purposes of the statutory scheme . . .").

Defendants contend that § 1637(n) does not address creditors charging pre-account opening fees like those in the program so it is appropriate to fill the statutory silence. This argument fails because if that were the case agencies would have unlimited power to fill any purported "gap" and make rules when there is no express commentary on an issue one way or the other. As the District of Columbia Circuit reasoned:

> [T]o suggest, as the Board effectively does, that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power . . . is both flatly unfaithful to the principles of administrative law . . . and refuted by precedent. Were courts to *presume* a delegation of power absent an express *withholding* of such power, agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well.

*Oil, Chem & Atomic Workers,* 46 F.3d at 90 (internal citations omitted). Moreover, there is clear direction from Congress that § 1637 only regulates fees that reduce the credit line, which would not include pre-account opening fees and would not equate to statutory silence.

Defendants also argue that the court does not have to guess what Congress would have done with First Premier's program because the text of TILA is the best evidence. Docket 37 at 23. Defendants cite *Mourning,* saying Congress knew that "some creditors would attempt to characterize their transactions so as to fall one step outside whatever boundary Congress attempted to establish." *Mourning*, 411 U.S. at 365. While *Mourning* is still good law, it only gives more deference to the Board. And the power of the Board to prevent circumvention of TILA is invoked only when an entity attempts to evade a boundary set by Congress. The boundary that Congress set here only applies to fees charged to the account balance that would surprise the consumer when the balance of the account is diminished due to these fees. With First Premier's fee, the consumer has no such surprise or reduction in credit because up-front fees are disclosed and must be paid in full from a liquid source before credit is extended.

Finally, defendants argue that extending the scope of § 1637 to include the pre-account opening fee at issue is not contrary to the purpose of TILA because this fee is the functional equivalent to the type of fee Congress was attempting to prevent. Docket 37 at 26. There is a marketable difference, however, between the pre-account opening fee that is not charged to the account balance and fees that are charged to the account balance. The pre-account opening fee will be paid before credit is extended and must be a conscious decision by the consumer. Fees charged to the account balance

24

after opening on the other hand, may be surprise fees that would appear on the account and would deplete the credit line. While the line between the two types of fees may be thin, the distinction is there, and Congress only expressly intended to reach the fees charged to the account itself. Moreover, the Supreme Court determined that functional equivalents are not enough when "Congress defined with specificity" what is subject to regulation. *Dimension*, 474 U.S. at 373-74.

Given the analysis above, First Premier demonstrated not only that it had a fair chance of winning the case on the merits, but that it is "likely" to prevail. While the Eighth Circuit has not determined whether agency regulations require the higher preliminary injunction test established in *Planned Parenthood*, First Premier wins under either the traditional *Dataphase* test or the heightened *Planned Parenthood* test. This factor weighs in favor of granting the preliminary injunction to First Premier so the court will analyze the remaining three factors.

### B.     Irreparable Harm

First Premier claims it will suffer irreparable harm if the preliminary injunction is not granted because it will lose goodwill with its customers, have to drastically reduce its workforce, incur substantial shut-down costs in preparation for the October 1 effective date, and the regulation will threaten First Premier's very existence by causing the loss of millions of dollars in profits, which are unrecoverable due to governmental sovereign immunity.

25

"If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other *Dataphase* factors." *Planned Parenthood*, 530 F.3d at 732. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Rogers Group, Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010) (citing *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). The irreparable harm factor requires plaintiffs "seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citations omitted). "Financial harm without more cannot constitute irreparable injury unless it threatens the very existence of the movant's business." *Ranchers Cattlemen Action Legal Fund v. U.S. Dep't of Agric.*, 566 F. Supp. 2d 995, 1007 (D.S.D. 2008) (citation omitted).

First Premier alleges and defendants admit that any monetary harm that First Premier incurs is not recoverable because defendants have governmental sovereign immunity. *See Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (recognizing the governmental entity has Eleventh Amendment sovereign immunity from federal actions requesting money damages and determining plaintiff demonstrated irreparable harm) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102-03

26

(1984)). This factor supports First Premier's position but is not conclusive on the potential harm issue.

First Premier also alleges substantial injury to the goodwill of its business. "Injury to reputation or goodwill is not easily measurable in monetary terms and so often is viewed as irreparable." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 at 159 (3d ed. 2008); *see also Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 867 (8th Cir. 1977). The Eighth Circuit has held that a district court did not err in finding that loss of goodwill with customers is sufficient to establish irreparable harm. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). A district court may require more than loss of goodwill to show irreparable harm, but the court has the discretion to determine whether that factor mandates more concrete proof. *Rogers Group*, 629 F.3d at 790 (citing *Gen. Motors*, 563 F.3d at 319-20).

First Premier does serve a unique market—customers with poor credit who rely on businesses like First Premier to acquire and improve credit. First Premier is one of few businesses in the country that offers such high-risk borrowers the chance to rebuild their credit history. Docket 28 at 33 (citing Beacom Aff. ¶ 26). In fact, First Premier has 20 percent of the market share of this type of business. *Id.* Any goodwill that First Premier has built with these customers could be lost if the program is shut down and these customers lose their main access source to credit.

27

First Premier also claims that it will lose numerous skilled employees if the regulation goes into effect. First Premier has already shown that it had to close one location in Spearfish, South Dakota, as a result of and in preparation for the amendment to Regulation Z. Docket 28 at 31; *see Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) (stating to prove irreparable injury the plaintiff must show "harm has occurred in the past and is likely to occur again"). Prior to the regulation, First Premier employed more than 1800 employees in South Dakota, and since that time it has laid off more than 300 employees and expects to lay off many more in its other operation centers if the amendment goes into effect. Docket 28 at 31. First Premier also has demonstrated that it is likely to decrease the workforce at additional sites if the preliminary injunction is not granted.

First Premier also argues that it has scaled back marketing efforts for the program, and the number of account openings has decreased significantly, which diminishes profits. Docket 28 at 30. First Premier opened more than 340,000 accounts under the program since it began. It estimates it would have opened more than 50,000 new accounts per month without the proposed amendment, which would have earned millions of dollars in profits. *Id.* at 31. First Premier forecasts that it will lose approximately $1,200,000 per month if the amendment goes into effect, assuming the typical account remains open for 24 months. Docket 41 ¶ 9. First Premier also showed that costs to shut down the program would be substantial as well as potential re-start costs if

28

the injunction is granted. Docket 28 at 32. First Premier claims that the proposed amendment threatens its very existence in part because within the next five years the up-front fee credit card under the program will account for 50 to 60 percent of its overall business. Docket 41 ¶ 7. After considering all of First Premier's proposed harms, the court finds that this factor, the threat of irreparable harm, weighs in favor of granting the preliminary injunction.

### C.   Balance of Harms

First Premier alleges that the balance of harms factor is in its favor because it would sustain substantial harm if the preliminary injunction is denied, and defendants' potential harm is slight. "The balance of harms analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public." *Ranchers Cattlemen Action Legal Fund*, 566 F. Supp. 2d at 1008 (citation omitted). Defendants contend that the public will be harmed if the 2011 regulation does not go into effect. First Premier has demonstrated substantial and likely harm to its business, employees, and future if the preliminary injunction is not granted. While both sides could be harmed, the potential harm to plaintiffs is more severe because the harms directly affect the heart of plaintiffs' business. Thus, the court finds that the balance of harms weighs in favor of granting the injunction.

### D.    Public Interest

First Premier demonstrated that the proposed amendment to Regulation Z is "likely" arbitrary and capricious or in excess of the Board's authority, and there is a public interest in protecting the business of one of the top employers in the state of South Dakota. Docket 29-1 at 18. The public has an interest in finding and keeping employment and maintaining businesses that grow the local economy. While the public has an interest in agencies administering laws that Congress enacts, the public interest is served by ensuring that those same agencies do not extend their power beyond the express delegation from Congress. The public has a clear interest that Congress's word be supreme and not extended or amended by agency action. *See Livestock Mktg. Ass'n*, 132 F. Supp. 2d at 829 ("The public has an interest in executive compliance with the restrictions placed upon an agency by Congress.").

A key factor to the public interest is access to the benefits of credit cards in this market economy. Consumers need readily available credit from credit cards to make car rentals, hotel reservations, and everyday purchases for entertainment, medical expenses, prescriptions, travel, and online shopping. Docket 30 ¶¶ 3-4. Credit cards like First Premier's also are important for consumers who are trying to rebuild credit and want to obtain savings on insurance, housing, and employment. *Id.* ¶ 5. Conversely, the public has an interest that potentially dangerous subprime credit cards with excessive fees

be regulated to protect consumers. Even with enjoinment of this portion of the proposed amendment, the initial statute and regulation continue to protect consumers against the reduction of the account's credit balance through excessive fees—the harm Congress intended to prevent. After weighing the public interest factor, the court finds that it weighs in favor of granting the preliminary injunction.

After weighing the factors established by *Dataphase* and applying the likely to prevail on the merits standard articulated in *Planned Parenthood*, First Premier has sufficiently demonstrated that it is "likely" to succeed on the merits of its claim because the Board acted in excess of its statutory authority, First Premier would suffer substantial harm if the injunction is not granted, that its harm outweighs defendants' harm, and that an injunction supports the public interest.

## II.    Bond Requirement

"The Federal Rules of Civil Procedure require the movant to give security for the issuance of a preliminary injunction." *Ranchers Cattlemen Action Legal Fund*, 566 F. Supp. 2d at 1008 (citing Fed. R. Civ. P. 65(c)). The Eighth Circuit affords much discretion to the district court to set bond, but it will reverse the district court if it abuses its discretion when setting the bond because of an improper purpose, or does not require an appropriate bond, or fails to articulate appropriate findings that support its determinations. *Id.* (citing *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991)).

31

The requirement of a bond is to ensure security for the nonmoving party and to prevent financial harm. In this case, the nonmoving party is the federal government, who will suffer no financial harm or loss in security that could be remedied through the recovery of a bond. Moreover, defendants did not request any form of security in any of its pleadings or in oral argument. Because defendants would suffer no pecuniary loss and the bond would not give defendants relief, the court finds the bond requirement unnecessary in this case.

## CONCLUSION

Accordingly, it is

ORDERED that First Premier's motion for preliminary injunction is granted. The effective date of the 2011 amendment to § 226.52 of Regulation Z is postponed, and the Board is enjoined from enforcing it.

IT IS FURTHER ORDERED that First Premier will post no security bond because defendants will suffer no pecuniary harm.

Dated September 23, 2011.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE